**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
August 18, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Hannah Warren
DEPUTY CLERK

**GRAYSON COTES,**

*Plaintiff,*

v.

**CITY OF ROANOKE, VIRGINIA,**

**SERVE**: City Attorney's Office
215 Church Avenue SW Room 464
Roanoke, VA, 24011

-AND-

**TERRY MCGUIRE,**

**SERVE**: 215 Church Avenue SW Room 456
Roanoke, VA 24011-1594

*Defendants.*

Civil Action No. 7:26CV00661

**JURY TRIAL DEMANDED**

**COMPLAINT**

I, Grayson Cotes ("Mr. Cotes" or "Plaintiff"), through pro se representation, bring this action against Defendant City of Roanoke, Virginia ("Roanoke") and Defendant Vice Mayor Terry McGuire ("Mr. McGuire") (collectively, "Defendants") under the U.S. Constitution's First and Fourteenth Amendments, Title VI of the Civil Rights Act of 1964, as amended, Virginia's Human Rights Act, Va. Code Ann. § 57-1, 42 U.S. Code § 1983, and the common law of Virginia.

## I. SUMMARY

1. This case involves religious discrimination, as well as violations of several state and federal laws (including, but not limited to, the First Amendment's Establishment Clause). Mr. Cotes has evidence that Defendants unlawfully discriminated and took illegal action against Mr. Cotes on the basis of his religion, as well as on the basis of exercising his First Amendment protected rights; Too, Mr. Cotes has evidence that city officials (specifically Mr. McGuire) took it upon themselves to give a Christian-based invocation in the absence of the scheduled Pastor (in violation of the First Amendment's Establishment Clause) yet refused to let Mr. Cotes give an invocation on the basis of his religion (again, in violation of the U.S. Constitution's First Amendment);

## *II. QUO WARRANTO*

2. These matters entangle federal and state law and therefore need to be heard within one Court, and this Court is most proper;

3. Defendant is the City of Roanoke and Plaintiff is a resident thereof, so it seems none other than just to have these matters resolved in this respective venue;

4. This statute, too: 42 U.S. Code § 1983;

## III. PARTIES

6. Mr. Cotes resides in Roanoke City, is a Virginia resident, and an American Citizen.

7. Mr. Cotes is a member of The Satanic Temple, and aligns with the beliefs thereof;

8. Defendant is the City of Roanoke, Virginia.

## IV. EXHAUSTION OF REMEDIES

9. Plaintiff is exhausting his remedies by bringing these matters to a Court of law.

## V. LAW

### A. Title VI of the Civil Rights Act of 1964

10. "Title VI, 42 U.S.C. § 2000d et seq., was enacted as part of the landmark Civil Rights Act of 1964. It prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. As President John F. Kennedy said in 1963: 'Simple justice requires that public funds, to which all taxpayers of all races [colors, and national origins] contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in racial [color or national origin] discrimination.'" — ***Source:*** https://www.justice.gov/crt/fcs/TitleVI

11. "Justice Stevens, with whom Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting. In 1964, as part of a ground breaking and comprehensive civil rights Act, Congress prohibited recipients of federal funds from discriminating on the basis of race, ethnicity, or national origin. Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. §§ 2000d to 2000d—7. Pursuant to powers 294 *294 expressly delegated by that Act, the federal agencies and departments responsible for awarding and administering federal contracts immediately adopted regulations prohibiting federal contractees from adopting policies that have the "effect" of discriminating on those bases. At the time of the promulgation of these regulations, prevailing principles of statutory construction assumed that Congress intended a private right of action whenever such a cause of action was necessary to protect individual rights granted by valid federal law. Relying both on

this presumption and on independent analysis of Title VI, this Court has repeatedly and consistently affirmed the right of private individuals to bring civil suits to enforce rights guaranteed by Title VI. A fair reading of those cases, and coherent implementation of the statutory scheme, requires the same result under Title VI's implementing regulations. In separate lawsuits spanning several decades, we have endorsed an action identical in substance to the one brought in this case, see *Lau* v. *Nichols*, 414 U. S. 563 (1974); demonstrated that Congress intended a private right of action to protect the rights guaranteed by Title VI, see *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979); and concluded that private individuals may seek declaratory and injunctive relief against state officials for violations of regulations promulgated pursuant to Title VI, see *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582 (1983). Giving fair import to our language and our holdings, every Court of Appeals to address the question has concluded that a private right of action exists to enforce the rights guaranteed both by the text of Title VI and by any regulations validly promulgated pursuant to that Title, and Congress has adopted several statutes that appear to ratify the status quo. Today, in a decision unfounded in our precedent and hostile to decades of settled expectations, a majority of this Court carves out an important exception to the right of private action long recognized under Title VI. In so doing, the 295 *295 Court makes three distinct, albeit interrelated, errors. First, the Court provides a muddled account of both the reasoning and the breadth of our prior decisions endorsing a private right of action under Title VI, thereby obscuring the conflict between those opinions and today's decision. Second, the Court offers a flawed and unconvincing analysis of the relationship between §§ 601 and

602 of the Civil Rights Act of 1964, ignoring more plausible and persuasive explanations detailed in our prior opinions. Finally, the Court badly misconstrues the theoretical linchpin of our decision in Cannon v. University of Chicago, 441 U. S. 677 (1979), mistaking that decision's careful contextual analysis for judicial fiat. I The majority is undoubtedly correct that this Court has never said in so many words that a private right of action exists to enforce the disparate-impact regulations promulgated under § 602. However, the failure of our cases to state this conclusion explicitly does not absolve the Court of the responsibility to canvass our prior opinions for guidance. Reviewing these opinions with the care they deserve, I reach the same conclusion as the Courts of Appeals: This Court has already considered the question presented today and concluded that a private right of action exists.[1] 296 *296 When this Court faced an identical case 27 years ago, all the Justices believed that private parties could bring lawsuits under Title VI and its implementing regulations to enjoin the provision of governmental services in a manner that discriminated against non-English speakers. See Lau v. Nichols, 414 U. S. 563 (1974). While five Justices saw no need to go beyond the command of § 601, Chief Justice Burger, Justice Stewart, and Justice Blackmun relied specifically and exclusively on the regulations to support the private action, see *id.*, at 569 (Stewart, J., concurring in result) (citing *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 369 (1973); *Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268, 280-281 (1969)). There is nothing in the majority's opinion in *Lau,* or in earlier opinions of the Court, that is not fully consistent with the analysis of the concurring Justices or that would have differentiated between private actions to enforce the text of § 601 and private actions to

enforce the regulations promulgated pursuant to § 602. See *Guardians*, 463 U. S., at 591 (principal opinion of White, J.) (describing this history and noting that, up to that point, no Justice had ever expressed disagreement with Justice Stewart's analysis in *Lau* ).[2] 297 *297 Five years later, we more explicitly considered whether a private right of action exists to enforce the guarantees of Title VI and its gender-based twin, Title IX. See *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979). In that case, we examined the text of the statutes, analyzed the purpose of the laws, and canvassed the relevant legislative history. Our conclusion was unequivocal: "We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination." *Id.*, at 703. The majority acknowledges that *Cannon* is binding precedent with regard to both Title VI and Title IX, *ante*, at 279-280, but seeks to limit the scope of its holding to cases involving allegations of intentional discrimination. The distinction the majority attempts to impose is wholly foreign to *Cannon* `s text and reasoning. The opinion in *Cannon* consistently treats the question presented in that case as whether a private right of action exists to enforce "Title IX" (and by extension "Title VI"),[3] and does not draw any distinctions between the various types of discrimination outlawed by the operation of those statutes. Though the opinion did not reach out to affirmatively preclude the drawing of every conceivable distinction, it could hardly have been more clear as to the scope of its holding: A private right of action exists for "victims of *the* prohibited discrimination." 441 U. S., at 703 (emphasis added). Not some of the prohibited discrimination, but all of it.[4] 298 *298 Moreover, *Cannon* was itself a

disparate-impact case. In that case, the plaintiff brought suit against two private universities challenging medical school admissions policies that set age limits for applicants. Plaintiff, a 39-year-old woman, alleged that these rules had the effect of discriminating against women because the incidence of interrupted higher education is higher among women than among men. In providing a shorthand description of her claim in the text of the opinion, we ambiguously stated that she had alleged that she was denied admission "because she is a woman," but we appended a lengthy footnote setting forth the details of her disparate-impact claim. Other than the shorthand description of her claim, there is not a word in the text of the opinion even suggesting that she had made the improbable allegation that the University of Chicago and Northwestern University had intentionally discriminated against women. In the context of the entire opinion (including both its analysis and its uncontested description of the facts of the case), that single ambiguous phrase provides no basis for limiting the case's holding to incidents of intentional discrimination. If anything, the fact that the phrase "because she is a woman" encompasses both intentional and disparate-impact claims should have made it clear that the reasoning in the opinion was equally applicable to both types of claims. In any event, the *holding* of the case certainly applied to the disparate-impact claim that was described in detail in footnote 1 of the opinion, *id.,* at 680. Our fractured decision in *Guardians Assn.* v. *Civil Serv. Comm'n of New York City,* 463 U. S. 582 (1983), reinforces the conclusion that this issue is effectively settled. While 299 *299 the various opinions in that case took different views as to the spectrum of relief available to plaintiffs in Title VI cases, a clear majority of the Court expressly stated that private parties may seek

injunctive relief against governmental practices that have the effect of discriminating against racial and ethnic minorities. *Id.,* at 594-595, 607 (White, J.); *id.,* at 634 (Marshall, J., dissenting); *id.,* at 638 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). As this case involves just such an action, its result ought to follow naturally from *Guardians.* As I read today's opinion, the majority declines to accord precedential value to *Guardians* because the five Justices in the majority were arguably divided over the mechanism through which private parties might seek such injunctive relief.[5] This argument inspires two responses. First, to the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U. S. C. § 1983 300 *300 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of rechallenging Alabama's English-only policy in a complaint that invokes § 1983 even after today's decision. More importantly, the majority's reading of *Guardians* is strained even in reference to the broader question whether injunctive relief is available to remedy violations of the Title VI regulations by nongovernmental grantees. As *Guardians* involved an action against a governmental entity, making § 1983 relief available, the Court might have discussed the availability of judicial relief without addressing the scope of the implied private right of action available directly under Title VI. See 463 U. S., at 638 (Stevens, J.) ("Even if it were not settled by now that Title VI authorizes appropriate relief, both prospective and retroactive, to victims of racial discrimination at the hands of recipients of federal funds,

the same result would follow in this case because the petitioners have sought relief under 42 U. S. C. § 1983" (emphasis deleted)). However, the analysis in each of the relevant opinions did not do so.[6] Rather than focusing on considerations 301 *301 specific to § 1983, each of these opinions looked instead to our opinion in *Cannon,* to the intent of the Congress that adopted Title VI and the contemporaneous executive decisionmakers who crafted the disparate-impact regulations, and to general principles of remediation.[7] In summary, there is clear precedent of this Court for the proposition that the plaintiffs in this case can seek injunctive relief either through an implied right of action or through § 1983. Though the holding in *Guardians* does not compel the conclusion that a private right of action exists to enforce the Title VI regulations against private parties, the rationales of the relevant opinions strongly imply that result. When that fact is coupled with our holding in *Cannon* and our unanimous decision in *Lau,* the answer to the question presented in this case is overdetermined.[8] Even absent my 302 *302 continued belief that Congress intended a private right of action to enforce both Title VI and its implementing regulations, I would answer the question presented in the affirmative and affirm the decision of the Court of Appeals as a matter of *stare decisis.*[9] 303 Underlying the majority's dismissive treatment of our prior cases is a flawed understanding of the structure of Title VI and, more particularly, of the relationship between §§ 601 and 602. To some extent, confusion as to the relationship between the provisions is understandable, as Title VI is a deceptively simple statute. Section 601 of the Act lays out its straightforward commitment: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d. Section 602 "authorize[s] and direct[s]" all federal departments and agencies empowered to extend federal financial assistance to issue "rules, regulations, or orders of general applicability" in order to "effectuate" § 601's antidiscrimination mandate. 42 U. S. C. § 2000d—1.[10] On the surface, the relationship between §§ 601 and 602 is unproblematic—§ 601 states a basic principle, § 602 authorizes agencies to develop detailed plans for defining the contours of the principle and ensuring its enforcement. In the context of federal civil rights law, however, nothing is ever so simple. As actions to enforce § 601's antidiscrimination principle have worked their way through the courts, we have developed a body of law giving content to § 601's broadly worded commitment. *E. g., United States* v. *Fordice,* 505 U. S. 717, 732, n. 7 (1992); *Guardians Assn.* v. *Civil Serv.* 304 *304 *Comm'n of New York City,* 463 U. S. 582 (1983); *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978). As the majority emphasizes today, the Judiciary's understanding of what conduct may be remedied in actions brought directly under § 601 is, in certain ways, more circumscribed than the conduct prohibited by the regulations. See, *e. g., ante,* at 280-281. Given that seeming peculiarity, it is necessary to examine closely the relationship between §§ 601 and 602, in order to understand the purpose and import of the regulations at issue in this case. For the most part, however, the majority ignores this task, assuming that the judicial decisions interpreting § 601 provide an authoritative interpretation of its true meaning and treating the regulations promulgated by the agencies charged with administering the statute as poor stepcousins—either parroting the text of § 601 (in the case of regulations that

prohibit intentional discrimination) or forwarding an agenda untethered to § 601's mandate (in the case of disparate-impact regulations). The majority's statutory analysis does violence to both the text and the structure of Title VI. Section 601 does not stand in isolation, but rather as part of an integrated remedial scheme. Section 602 exists for the sole purpose of forwarding the antidiscrimination ideals laid out in § 601.[11] The majority's persistent belief that the two sections somehow forward different agendas finds no support in the statute. Nor does Title VI anywhere suggest, let alone state, that for the purpose of determining their legal effect, the "rules, regulations, [and] orders of general applicability" adopted by the agencies are to be bifurcated by the Judiciary into two categories based on how closely the courts believe the regulations track the text of § 601. 305 *305 What makes the Court's analysis even more troubling is that our cases have already adopted a simpler and more sensible model for understanding the relationship between the two sections. For three decades, we have treated § 602 as granting the responsible agencies the power to issue broad prophylactic rules aimed at realizing the vision laid out in § 601, even if the conduct captured by these rules is at times broader than that which would otherwise be prohibited. In *Lau,* our first Title VI case, the only three Justices whose understanding of § 601 required them to reach the question explicitly endorsed the power of the agencies to adopt broad prophylactic rules to enforce the aims of the statute. As Justice Stewart explained, regulations promulgated pursuant to § 602 may "go beyond . . . § 601" as long as they are "reasonably related" to its antidiscrimination mandate. 414 U. S., at 571 (Stewart, J., joined by Burger, C. J., and Blackmun, J., concurring in result). In *Guardians,* at least three Members of the Court

adopted a similar understanding of the statute. See 463 U. S., at 643 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). Finally, just 16 years ago, our unanimous opinion in *Alexander* v. *Choate,* 469 U. S. 287 (1985), treated this understanding of Title VI's structure as settled law. Writing for the Court, Justice Marshall aptly explained the interpretation of § 602's grant of regulatory power that necessarily underlies our prior case law: "In essence, then, we [have] held that Title VI [has] delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and [are] readily enough remediable, to warrant altering the practices of the federal grantees that [have] produced those impacts." *Id.,* at 293-294. This understanding is firmly rooted in the text of Title VI. As § 602 explicitly states, the agencies are authorized to adopt regulations to "effectuate" § 601's antidiscrimination mandate. 42 U. S. C. § 2000d—1. The plain meaning of the 306 *306 text reveals Congress' intent to provide the relevant agencies with sufficient authority to transform the statute's broad aspiration into social reality. So too does a lengthy, consistent, and impassioned legislative history.[12] This legislative design reflects a reasonable—indeed inspired—model for attacking the often-intractable problem of racial and ethnic discrimination. On its own terms, the statute supports an action challenging policies of federal grantees that explicitly or unambiguously violate antidiscrimination norms (such as policies that on their face limit benefits or services to certain races). With regard to more subtle forms of discrimination (such as schemes that limit benefits or services on ostensibly race-neutral grounds but have the predictable and perhaps intended consequence of materially benefiting some races at the expense of

others), the statute does not establish a static approach but instead empowers the relevant agencies to evaluate social circumstances to determine whether there is a need for stronger measures.[13] 307 *307 Such an approach builds into the law flexibility, an ability to make nuanced assessments of complex social realities, and an admirable willingness to credit the possibility of progress. The "effects" regulations at issue in this case represent the considered judgment of the relevant agencies that discrimination on the basis of race, ethnicity, and national origin by federal contractees are significant social problems that might be remedied, or at least ameliorated, by the application of a broad prophylactic rule. Given the judgment underlying them, the regulations are inspired by, at the service of, and inseparably intertwined with § 601's antidiscrimination mandate. Contrary to the majority's suggestion, they "appl[y]" § 601's prohibition on discrimination just as surely as the intentional discrimination regulations the majority concedes are privately enforceable. *Ante,* at 284. To the extent that our prior cases mischaracterize the relationship between §§ 601 and 602, they err on the side of underestimating, not overestimating, the connection between the two provisions. While our cases have explicitly adopted an understanding of § 601's scope that is somewhat narrower than the reach of the regulations,[14] they have done so in an unorthodox and somewhat haphazard fashion. Our conclusion that the legislation only encompasses intentional discrimination was never the subject of thorough consideration by a Court focused on that question. In *Bakke,* five Members of this Court concluded that § 601 only prohibits race-based affirmative-action programs in situations where the Equal Protection Clause would impose a similar ban. 438 U. S., at 287 (principal opinion of Powell, J.);

*id.*, at 308 *308 325, 328, 352 (Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part).[15] In *Guardians,* the majority of the Court held that the analysis of those five Justices in *Bakke* compelled *as a matter of stare decisis* the conclusion that § 601 does not on its own terms reach disparate-impact cases. 463 U. S., at 610-611 (Powell, J., concurring in judgment); *id.* , at 612 (O'Connor, J., concurring in judgment); *id.,* at 642 (Stevens, J., joined by Brennan and Blackmun, JJ., dissenting). However, the opinions adopting that conclusion did not engage in any independent analysis of the reach of § 601. Indeed, the only writing on this subject came from two of the five Members of the *Bakke* "majority," each of whom wrote separately to reject the remaining Justices' understanding of their opinions in *Bakke* and to insist that § 601 does in fact reach some instances of unintentional discrimination. 463 U. S., at 589-590 (White, J.); *id.,* at 623-624 (Marshall, J., dissenting).[16] The Court's occasional rote invocation of this *Guardians* majority in later cases ought not obscure the fact that the question whether § 601 applies to disparate-impact claims has never been analyzed by this Court on the merits.[17] 309 *309 In addition, these Title VI cases seemingly ignore the well-established principle of administrative law that is now most often described as the "*Chevron* doctrine." See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). In most other contexts, when the agencies charged with administering a broadly worded statute offer regulations interpreting that statute or giving concrete guidance as to its implementation, we treat their interpretation of the statute's breadth as controlling unless it presents an unreasonable construction of the statutory text. See *ibid.* While there may be some

dispute as to the boundaries of *Chevron* deference, see, *e. g.*, Christensen v. Harris County, 529 U. S. 576 (2000), it is paradigmatically appropriate when Congress has clearly delegated agencies the power to issue regulations with the force of law and established formal procedures for the promulgation of such regulations.[18] If we were writing on ablank slate, we might very well conclude that *Chevron* and similar cases decided both before and after *Guardians* provide the proper framework for understanding the structure of Title VI. Under such a reading there would be no incongruity between §§ 601 and 602. Instead, we would read § 602 as granting the federal agencies responsible for distributing federal funds the authority 310 *310 to issue regulations interpreting § 601 on the assumption that their construction will—if reasonable—be incorporated into our understanding of § 601's meaning.[19] To resolve this case, however, it is unnecessary to answer the question whether our cases interpreting the reach of § 601 should be reinterpreted in light of *Chevron.* If one understands the relationship between §§ 601 and 602 through the prism of *either Chevron* or our prior Title VI cases, the question presented all but answers itself. If the regulations promulgated pursuant to § 602 are either an authoritative construction of § 601's meaning or prophylactic rules necessary to actualize the goals enunciated in § 601, then it makes no sense to differentiate between private actions to enforce § 601 and private actions to enforce § 602. There is but one private action to enforce Title VI, and we already know that such an action exists.[20] See Cannon, 441 U. S., at 703. 311 *311 III The majority couples its flawed analysis of the structure of Title VI with an uncharitable understanding of the substance of the divide between those on this Court who are reluctant to interpret statutes to allow for private

rights of action and those who are willing to do so if the claim of right survives a rigorous application of the criteria set forth in Cort v. *Ash*, 422 U. S. 66 (1975). As the majority narrates our implied right of action jurisprudence, *ante,* at 286-287, the Court's shift to a more skeptical approach represents the rejection of a common-law judicial activism in favor of a principled recognition of the limited role of a contemporary "federal tribuna[l]." *Ante,* at 287. According to its analysis, the recognition of an implied right of action when the text and structure of the statute do not absolutely compel such a conclusion is an act of judicial self-indulgence. As much as we would like to help those disadvantaged by discrimination, we must resist the temptation to pour ourselves "one last drink." *Ibid.* To do otherwise would be to "ventur[e] beyond Congress's intent." *Ibid.* Overwrought imagery aside, it is the majority's approach that blinds itself to congressional intent. While it remains true that, if Congress intends a private right of action to support statutory rights, "the far better course is for it to specify as much when it creates those rights," *Cannon*, 441 312 *312 U. S., at 717, its failure to do so does not absolve us of the responsibility to endeavor to discern its intent. In a series of cases since *Cort* v. *Ash,* we have laid out rules and developed strategies for this task. The very existence of these rules and strategies assumes that we will sometimes find manifestations of an implicit intent to create such a right. Our decision in *Cannon* represents one such occasion. As the *Cannon* opinion iterated and reiterated, the question whether the plaintiff had a right of action that could be asserted in federal court was a "question of statutory construction," 441 U. S., at 688; see also *id.,* at 717 (Rehnquist, J., concurring), not a question of policy for the Court to decide. Applying the *Cort* v. *Ash*

factors, we examined the nature of the rights at issue, the text and structure of the statute, and the relevant legislative history.[21] Our conclusion was that Congress unmistakably intended a private right of action to enforce both Title IX and Title VI. Our reasoning—and, as I have demonstrated, our holding—was equally applicable to intentional discrimination and disparate-impact claims.[22] Underlying today's opinion is the conviction that *Cannon* must be cabined because it exemplifies an "expansive rights creating 313 *313 approach." *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 77 (1992) (Scalia, J., concurring in judgment). But, as I have taken pains to explain, it was Congress, not the Court, that created the cause of action, and it was the Congress that later ratified the *Cannon* holding in 1986 and again in 1988. See 503 U. S., at 72-73. In order to impose its own preferences as to the availability of judicial remedies, the Court today adopts a methodology that blinds itself to important evidence of congressional intent. It is one thing for the Court to ignore the import of our holding in *Cannon,* as the breadth of that precedent is a matter upon which reasonable jurists may differ. It is entirely another thing for the majority to ignore the reasoning of that opinion and the evidence contained therein, as those arguments and that evidence speak directly to the question at issue today. As I stated above, see n. 21, *supra, Cannon* carefully explained that both Title VI and Title IX were intended to benefit a particular class of individuals, that the purposes of the statutes would be furthered rather than frustrated by the implication of a private right of action, and that the legislative histories of the statutes support the conclusion that Congress intended such a right. See also Part IV, *infra.* Those conclusions and the evidence supporting them continue to have force today. Similarly, if

the majority is genuinely committed to deciphering congressional intent, its unwillingness to even consider evidence as to the context in which Congress legislated is perplexing. Congress does not legislate in a vacuum. As the respondents and the Government suggest, and as we have held several times, the objective manifestations of congressional intent to create a private right of action must be measured in light of the enacting Congress' expectations as to how the judiciary might evaluate the question. See Thompson v. Thompson, 484 U. S. 174 (1988); Merrill Lynch, 314 *314 *Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 378— 379 (1982); *Cannon,* 441 U. S., at 698-699.[23] At the time Congress was considering Title VI, it was normal practice for the courts to infer that Congress intended a private right of action whenever it passed a statute designed to protect a particular class that did not contain enforcement mechanisms which would be thwarted by a private remedy. See Merrill Lynch, 456 U. S., at 374-375 (discussing this history). Indeed, the very year Congress adopted Title VI, this Court specifically stated that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U. S. 426, 433 (1964). Assuming, as we must, that Congress was fully informed as to the state of the law, the contemporary context presents important evidence as to Congress' intent—evidence the majority declines to consider. Ultimately, respect for Congress' prerogatives is measured in deeds, not words. Today, the Court coins a new rule, holding that a private cause of action to enforce a statute does not encompass a substantive regulation issued to effectuate that statute unless the regulation does nothing more than "authoritatively construe the statute itself." *Ante,* at 284.[24] This rule might be proper if

we were the kind of 315 *315 "common-law court" the majority decries, *ante,* at 287, inventing private rights of action never intended by Congress. For if we are not construing a statute, we certainly may refuse to create a remedy for violations of federal regulations. But if we are faithful to the commitment to discerning congressional intent that all Members of this Court profess, the distinction is untenable. There is simply no reason to assume that Congress contemplated, desired, or adopted a distinction between regulations that merely parrot statutory text and broader regulations that are authorized by statutory text.[25] IV Beyond its flawed structural analysis of Title VI and an evident antipathy toward implied rights of action, the majority offers little affirmative support for its conclusion that Congress did not intend to create a private remedy for violations of the Title VI regulations.[26] The Court offers essentially 316 *316 two reasons for its position. First, it attaches significance to the fact that the "rights-creating" language in § 601 that defines the classes protected by the statute is not repeated in § 602. *Ante,* at 288-289. But, of course, there was no reason to put that language in § 602 because it is perfectly obvious that the regulations authorized by § 602 must be designed to protect precisely the same people protected by § 601. Moreover, it is self-evident that, linguistic niceties notwithstanding, any statutory provision whose stated purpose is to "effectuate" the eradication of racial and ethnic discrimination has as its "focus" those individuals who, absent such legislation, would be subject to discrimination. Second, the Court repeats the argument advanced and rejected in *Cannon* that the express provision of a fund cutoff remedy "suggests that Congress intended to preclude others." *Ante,* at 290. In *Cannon,* 441 U. S., at 704-708, we carefully explained why the presence of an explicit

mechanism to achieve one of the statute's objectives (ensuring that federal funds are not used "to support discriminatory practices") does not preclude a conclusion that a private right of action was intended to achieve the statute's other principal objective ("to provide individual citizens effective protection against those practices"). In support of our analysis, we offered policy arguments, cited evidence from the legislative history, and noted the active support of the relevant agencies. *Ibid.* In today's decision, the Court does not grapple 317 *317 with—indeed, barely acknowledges—our rejection of this argument in *Cannon.* Like much else in its opinion, the present majority's unwillingness to explain its refusal to find the reasoning in *Cannon* persuasive suggests that today's decision is the unconscious product of the majority's profound distaste for implied causes of action rather than an attempt to discern the intent of the Congress that enacted Title VI of the Civil Rights Act of 1964. Its colorful disclaimer of any interest in "venturing beyond Congress's intent," *ante,* at 287, has a hollow ring.V The question the Court answers today was only an open question in the most technical sense. Given the prevailing consensus in the Courts of Appeals, the Court should have declined to take this case. Having granted certiorari, the Court should have answered the question differently by simply according respect to our prior decisions. But most importantly, even if it were to ignore all of our post-1964 writing, the Court should have answered the question differently on the merits.I respectfully dissent." — ***Alexander v. Sandoval, 532 US 275 - Supreme Court 2001***

**B. Virginia's Human Rights Act**

12. § 2.2-3900 (B) reads, "It is the policy of the Commonwealth to: 1. Safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, ethnic or national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, military status, or disability in places of public accommodation…"

13. There's no cap on relief, under the VHRA.

**C. <u>Va. Code. Ann. § 57.1</u>**

14. "The General Assembly, on January 16, 1786, passed an act in the following words: "Whereas, Almighty God hath created the mind free; that all attempts to influence it by temporal punishment, or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the Holy Author of our religion, who, being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do; that the impious presumption of legislators and rulers, civil as well as ecclesiastical, who, being themselves but fallible and uninspired men, have assumed dominion over the faith of others, setting up their own opinions and modes of thinking as the only true and infallible, and as such endeavoring to impose them on others, have established and maintained false religions over the greatest part of the world, and through all time; that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical, and even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular

pastor whose morals he would make his pattern, and whose powers he feels most persuasive to righteousness, and is withdrawing from the ministry those temporary rewards which, proceeding from an approbation of their personal conduct, are an additional incitement to earnest and unremitting labors, for the instruction of mankind; that our civil rights have no dependence on our religious opinions any more than our opinions in physics or geometry; that therefore the proscribing any citizen as unworthy the public confidence by laying upon him an incapacity of being called to offices of trust and emolument, unless he profess or renounce this or that religious opinion, is depriving him injuriously of those privileges and advantages to which, in common with his fellow citizens, he has a natural right; that it tends only to corrupt the principles of that religion it is meant to encourage, by bribing, with a monopoly of worldly honors and emoluments, those who will externally profess and conform to it; that though, indeed, those are criminal who do not withstand such temptation, yet, neither are those innocent who lay the bait in their way; that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy, which at once destroys all religious liberty, because he, being of course judge of that tendency, will make his opinions the rules of judgment, and approve or condemn the sentiments of others only as they shall square with or differ from his own; that it is time enough for the rightful purposes of civil government, for its officers to interfere, when principles break out into overt acts against peace and good order; and finally, that truth is great and will prevail, if left to herself; that she is the proper and sufficient antagonist to error, and has nothing to fear from the

conflict, unless by human interposition disarmed of her natural weapons, free argument and debate; errors ceasing to be dangerous when it is permitted freely to contradict them: "Be it enacted by the General Assembly, That no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall be enforced, restrained, molested or burthened, in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion, and that the same shall in no wise diminish, enlarge or affect their civil capacities. "And though we well know that this Assembly, elected by the people for the ordinary purposes of legislation only, have no power to restrain the acts of succeeding assemblies constituted with powers equal to our own, and that, therefore, to declare this act to be irrevocable would be of no effect in law; yet we are free to declare, and do declare, that the rights hereby asserted are of the natural rights of mankind; and that if any act shall be hereafter passed to repeal the present, or to narrow its operation, such act will be an infringement of natural right."

**D. U.S. Constitution's First Amendment**

15. The First Amendment reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

16. "...The *Sum of all* we drive at is, That every Man may enjoy the same Rights that are granted to others....Whatsoever things are left free by Law in the common occasions of Life, let them remain free...Let no Mans Life, or Body, or House, or

Estate, suffer any manner of Prejudice upon these Accounts…." — ***A Letter Concerning Toleration by John Locke (1689)***

17. "3. Because it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of Citizens, and one of the noblest characteristics of the late Revolution. The free men of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? that the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" — ***Memorial and Remonstrance against Religious Assessments by James Madison (1785)***

18. "8. Because the establishment in question is not necessary for the support of Civil Government. If it be urged as necessary for the support of Civil Government only as it is a means of supporting Religion, and it be not necessary for the latter purpose, it cannot be necessary for the former. If Religion be not within the cognizance of Civil Government how can its legal establishment be necessary to Civil Government? What influence in fact have ecclesiastical establishments had on Civil Society? In some instances they have been seen to erect a spiritual tyranny on the ruins of the Civil authority; in many instances they have been seen upholding the

thrones of political tyranny: in no instance have they been seen the guardians of the liberties of the people. Rulers who wished to subvert the public liberty, may have found an established Clergy convenient auxiliaries. A just Government instituted to secure & perpetuate it needs them not. Such a Government will be best supported by protecting every Citizen in the enjoyment of his Religion with the same equal hand which protects his person and property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another." — ***Memorial and Remonstrance against Religious Assessments by James Madison (1785)***

19. "9. Because the proposed establishment is a departure from that generous policy, which, offering an Asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country, and an accession to the number of its citizens. What a melancholy mark is the Bill of sudden degeneracy? Instead of holding forth an Asylum to the persecuted, it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those in Legislative authority..." — ***Memorial and Remonstrance against Religious Assessments by James Madison (1785)***

20. "...Be it enacted by General Assembly that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all me shall be free to profess , and by argument to maintain, their opinions in matters of Religion, and that the same shall in no wise diminish, enlarge or affect their civil

capacities..." — ***The Virginia Statute for Religious Freedom by Thomas Jefferson (1786)***

21. "Because the bill...comprises a principle and precedent for the appropriation of funds of the United States for the use and support of religious societies, contrary to the article of the Constitution which declares that 'Congress shall make no law respecting a religious establishment.'" — ***Veto Message on Act of Relief for the Baptist Church by James Madison (1811)***

22. In reference to *Lemon v. Kurtzman (1971)*: "...The law's purpose must be secular, the law can neither advance nor harm religion as its primary effect, and the law cannot create an excessive entanglement between religion and government..." — ***Corey Brettschneider in Religious Freedom***

23. "This Nation is heir to a history and tradition of religious diversity that dates from the settlement of the North American Continent. Sectarian differences among various Christian denominations were central to the origins of our Republic. Since then, adherents of religion too numerous to name have made the United States their home, as have those whose beliefs expressly exclude religion.Precisely because of the religious diversity that is our national heritage, the Founders added to the Constitution a Bill of Rights, the very first words of which declare: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...' Perhaps in the early days of the Republic these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.' It is settled law that no

government official in the Nation may violate these fundamental constitutional rights regarding matters of conscience...Furthermore, the creche sits on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government. No viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the 'display of the creche in this particular physical setting ,' the county sends an unmistakeable message that it supports and promotes the Christian praise to God that is the creche's religious message." — ***County of Allegheny v. ACLU, Greater Pittsburgh Chapter (1989)***

24. "This lawsuit was filed on February 26, 2018 by "The Satanic Temple" and Michelle Shortt. Doc. 1. It seeks a declaratory judgment that the City's exclusion of minority religions, and the specific denial of Ms. Shortt's invocation, violate the Establishment and Equal Protection Clauses. Doc. 57 at 8. It also seeks to enjoin the City from denying non-Christian groups the opportunity to give the invocation. *Id.* at 9... Despite the City's argument to the contrary, Ms. Shortt has put forth enough facts to plausibly suggest she has suffered an "injury in fact" by not being permitted to give the invocation, that the injury is traceable to the City's actions in removing her from the invocation schedule, and that the Court could redress her injury. *See* *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130...Other portions of the record suggest, however, that Plaintiffs view themselves as a religion. Ms. Shortt testified that she sought to give the invocation on behalf of the "religion" of "Satanism." Doc. 63-1 at 24. Ms. Shortt "was given the authority to speak on behalf of the Satanic Temple in regard to the invocation in

Arizona." *Id.* She viewed the invocation as an exercise of TST's "religious views." Doc. 63-1 at 54-55. Ms. Shortt referred to Satanism as "our religion," and noted that "[w]e are, first and foremost, a religion." Doc. 63-1 at 34. 777 *777 Similarly, Douglas Misicko, the founder of TST, Inc., views "Satanism [as] the religion of the Satanic Temple." Doc. 63-1 at 109. In the "FAQ" portion of TST, Inc.'s website, the organizations explained the religious nature of its beliefs: Satanism provides all that a religion should be without a compulsory attachment to untenable items of faith-based belief. It provides a narrative structure by which we contextualize our lives and works. It also provides a body of symbolism and religious practice — a sense of identity, culture, community, and shared values. The Satanic Temple, FAQ, https://thesatanictemple.com/pages/faq (last visited Nov. 5, 2019). The Arizona chapter states that "[a]s a religious organization, TST serves the religious needs of our members, no matter who they are or how they identify[.]" *See* The Satanic Temple Arizona, TST AZ FAQ, https://thesatanictemplearizona.com/about/faq/ (last visited Nov. 5, 2019). The Arizona website further notes that "[m]odern Satanism is an individual path, one that is religious and atheistic in nature, that demands study of the practitioner and requires independent thought." *Id.* More precisely, the religion that TST identifies with is "satanism," and the "organization by which [they] express [their] ideals is through The Satanic Temple." *Id.* Even if unconventional, these beliefs would be considered religious under the language of some cases that do not concern legislative prayer. *See, e.g.,* *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (to qualify as religious, beliefs must be "sincerely held" and, "in the claimant's scheme of things, religious in nature"); *Torcaso v. Watkins,* 367 U.S.

488, 495 n.11, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) ("Among religions in this country which do not teach what would generally be considered a belief in the existence of God are ... Ethical Culture, Secular Humanism[,] and others."); *Kaufman v. McCaughtry*, 419 F.3d 678, 684 (7th Cir. 2005) (inmate's atheism qualified as a "religion" for purposes of First Amendment); *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229 (9th Cir. 1996) ("a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters," "consists of a belief-system as opposed to an isolated teaching," and "often can be recognized by the presence of certain formal and external signs"); *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) ("Religious beliefs, then, are those that stem from a person's moral, ethical, or religious beliefs about what is right and wrong and are held with the strength of traditional religious convictions." (quotation marks and citation omitted)); *Am. Humanist Ass'n v. United States*, 63 F. Supp. 3d 1274, 1283 (D. Or. 2014) (finding that Secular Humanism is a religion for Establishment Clause purposes).[4]" — ***Satanic Temple, Inc. v. City of Scottsdale, 423 F Supp. 3d 766 - List. Court, D. Arizona 2019.***

**E. U.S. Constitution's Fourteenth Amendment**

25. Section One reads, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

## VI. FACTS

26. Mr. Cotes is a resident of Virginia—specifically, Roanoke City, Virginia;

27. In violation of the U.S. Constitution's First Amendment's Establishment Clause, Mr. Cotes' designated polling place is at a Christian-based church—a faith of which Mr. Cotes rejects and does not subscribe to;

28. On August 17, 2026, Mr. Cotes went to his first city council meeting and the following events occurred:

29. Tonight, I went to my first City of Roanoke, Virginia - Government Council Meeting, hoping to speak on the dangers and disparities that come with eviction blanket-bans;

30. Prior to the meeting, I had conducive conversations with people, and attended a little portion of the rally that took place before the meeting;

31. Once we were about to start, I looked at the meeting schedule/agenda and noticed that an Invocation was scheduled to be given by The Reverend Amy Hodge—a pastor at Mt. Zion AME Church;

32. However, Ms. Hodge did not show.

33. At that time, once confirming that Ms. Hodge was not present, Vice Mayor Terry McGuire—a government official—assumed the role to give the invocation upon himself.

34. Promptly, as everyone was standing, I raised my hand and said that I would give the Invocation.

35. Vice Mayor McGuire then stopped, and was about to let me give such Invocation, until I told him I was a member of The Satanic Temple.

36. He said that, instead of allowing me—like he was originally going to do, prior to the reveal of my religious beliefs—I could sign up to potentially speak at another time.

37. I disagreed and started to give my Invocation as he gave his.

38. Immediately an Officer walked up to me, told me to stop, physically threatened me by putting black, rubber gloves on—physically insinuating that he would put his hands on me—and once I finished my Invocation, escorted me out of the room, to the elevators where two more officers were coming up out of the elevator.

39. The initial officer then told them to escort me off of the property—which they did not hesitate to do, though they were much more cordial than he.

40. Primarily, the Vice Mayor's change of mind and ultimate denial to allow me to give an Invocation, after the reveal of my religious beliefs, is a direct violation of the U.S. Constitution's First Amendment.

41. Secondarily, the Vice Mayor taking it upon himself to deliver a Christian-based invocation—while simultaneously denying me the right to give an Invocation—is another violation of the U.S. Constitution's First Amendment: Establishment Clause and Free Exercise Clause.

42. In addition to the first two Constitutional violations, escorting me off public property (which my tax dollars help fund) by public officers (which my tax dollars also

help pay), for merely exercising my First Amendment right to Freedom of Speech and Freedom of Religion is beyond unconstitutional;

43. Mr. Cotes now brings this Complaint;

## VII. CAUSES OF ACTION

### COUNT I

**Defendants Violated Title VI of the Civil Rights Act of 1964 by Discriminating Against Plaintiff on the Basis of His Religion**

44. Mr. Cotes re-alleges and incorporates by reference lines/paragraphs 1-43 as if fully set forth in this Count I;

### COUNT II

**Defendants Violated Virginia's Human Rights Act by Discriminating Against Plaintiff on the Basis of His Religion**

45. Mr. Cotes re-alleges and incorporates by reference lines/paragraphs 1-44 as if fully set forth in this Count II;

### COUNT III

**Defendants Violated the U.S. Constitution's First Amendment's Establishment Clause, as a City Official (Vice Mayor McGuire) Gave a Christian-based Invocation at a Public City Council Meeting, on August 17, 2026**

46. Mr. Cotes re-alleges and incorporates by reference lines/paragraphs 1-45 as if fully set forth in this Count III;

### COUNT IV

**Defendants Violated the U.S. Constitution's First Amendment's Free Exercise Clause by Suppressing Mr. Cotes' Right to Give a Satanic-based Invocation**

47. Plaintiff re-alleges and incorporates by reference paragraphs 1-46 as if fully set forth in this Count IV;

## COUNT V

**Defendants Violated Va. Code Ann. § 57.1 by Discriminating Against Mr. Cotes on the Basis of His Religion**

48. Plaintiff re-alleges and incorporates by reference paragraphs 1-47 as if fully set forth in this Count V;

## COUNT VI

**Defendants Violated the U.S. Constitution's First Amendment's Establishment Clause by Establishing a City Voting/Polling Place at a Christian-based Church**

49. Plaintiff re-alleges and incorporates by reference paragraphs 1-48 as if fully set forth in this Count VI;

## COUNT VII

**Defendants Violated the U.S. Constitution's Fourteenth Amendment's Amendment's Due Process Clause by Depriving Mr. Cotes of His Liberties**

50. Plaintiff re-alleges and incorporates by reference paragraphs 1-49 as if fully set forth in this Count VII;

## COUNT VIII

**Defendants Violated the U.S. Constitution's Fourteenth Amendment's Equal Protection Clause by Discriminating Against Mr. Cotes on the Basis of His Religion**

51. Plaintiff re-alleges and incorporates by reference paragraphs 1-47 as if fully set forth in this Count VIII;

## VIII. URGE FOR RELIEF

**WHEREFORE**, Plaintiff Grayson Cotes urges this Court for an Order:

a. Declaring that Defendants violated Title VI by discriminating against Mr. Cotes on the basis of his religion; and,

b. Declaring that Defendants violated Virginia's Human Rights Act by discriminating against Mr. Cotes on the basis of his religion; and,

c. Declaring that Defendants violated the U.S. Constitution's First Amendment's Free Exercise Clause by suppressing Mr. Cotes' right to give an Invocation; and,

d. Declaring that Defendants violated the U.S. Constitution's First Amendment's Establishment Clause, as a government official (Vice Mayor McGuire) delivered a Christian-based Invocation while simultaneously denying Mr. Cotes the right to give an Satanic-based Invocation; and,

e. Declaring that Defendants violated the First Amendment's Free Exercise Clause and Establishment Clause by escorting him off public property, for exercising his First Amendment's guaranteed rights to freedom of speech and freedom of religion; and,

f. Declaring that Defendants violated the First Amendment's Free Exercise Clause and Establishment Clause by establishing a voting/polling place at a Christian-based church; and,

g. Declaring that Defendants violated the Fourteenth Amendment's Due Process Clause by depriving Mr. Cotes of his right to attend a City Council Meeting; and,

h. Declaring that Defendants violated the Fourteenth Amendment's Due Process Clause and Equal Protection Clause by depriving Mr. Cotes the right to express his religion, free speech, and give a Satanic-based invocation; and,

i. Declaring that Defendants violated the Fourteenth Amendment's Equal Protection Clause by Discriminating against Mr. Cotes on the basis of his religion; and,

j. Requiring Defendants to collectively pay Mr. Cotes, in the form of non-economic compensatory damages and relief, not to exceed a total of $12.2 Million; and,

k. Requiring Defendants to pay Mr. Cotes any other relief that would be just, ethical, and constitutional;

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

August 18, 2026

GRAYSON COTES

By: _/s/ Grayson Cotes_
Grayson Cotes
*Plaintiff*

Grayson Cotes
2351 Berkley Ave,
Roanoke, Virginia 24015
graysoncotes@gmail.com
540-397-6274

*Plaintiff*